**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **FARZIN AFRASIABIPOUR,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **PENNSYLVANIA DEPARTMENT OF** | **NO.  17-5214** |
| **TRANSPORTATION,** | |
| **Defendant.** | |

DuBois, J.                                                            June 25, 2020

## M E M O R A N D U M

### I.    INTRODUCTION

This is a discrimination and retaliation case arising from the termination of plaintiff, Farzin Afrasiabipour, from his position as a civil engineer for defendant, Pennsylvania Department of Transportation ("PennDOT").  Plaintiff alleges that he was subjected to discrimination based on his race and national origin, and that defendant retaliated against him for filing a complaint with the Equal Employment Opportunity Commission ("EEOC").  Plaintiff asserts six causes of action for discrimination and retaliation under federal and state law.  Presently before the Court is Defendant's Motion for Summary Judgment.  For the reasons that follow, the Motion is granted.

### II.    BACKGROUND[1]

#### A.  Plaintiff's Employment with PennDOT

Plaintiff, a Persian man, was born in Iran, and earned his BS in engineering in the United States.  Def.'s Statement Undisputed Facts ¶ 1 [hereinafter Def.'s SUF]; Compl. ¶ 2.  "He was hired by PennDOT in 1995, became a civil engineer trainee in 1996 and a civil engineer transportation (traffic engineer) at PennDOT 's District 6 in 2000."  *Id.* ¶ 2.  "His duties as a

---

[1]    The facts are presented in the light most favorable to plaintiff.  Disputed facts are noted as such.

traffic engineer included reviewing highway occupancy permit applications and accompanying attachments that applicants submitted to PennDOT." *Id.* ¶ 3.  "As part of that review, plaintiff was responsible for generating comments in PennDOT's electronic permitting system which detail any deficiencies in the submitted documentation.  Plaintiff was also expected to conduct onsite visits, take sight distance measurements, assess drainage features, flag design flaws, and compare the submitted plans to the physical site." *Id.*  During the relevant period, plaintiff's direct supervisor was John Otten, and Otten's supervisor was Francis Hanney, the Traffic Services manager for District 6. *Id.* ¶ 6.

Plaintiff testified that he began experiencing differential treatment when Hanney became the district's Traffic Services manager in 2005 or 2006. *Id.* ¶ 6; Pl.'s Dep 83:2-19.  Specifically, plaintiff testified that: there "was a conspiracy fabricated by Fran Hanney just to terminate [his] employment."  Pl.'s Dep 85:6-7.  Without referring to specific individuals, plaintiff stated that: "they were following [him]. They were listening to [his] conversations.  Every time [his] phone [would] ring, they would stop talking and laughing and listen to [his] phone conversations;" *Id.* at 86:8-12, and that they "follow[ed] [him]," watched him though windows in the office and "watch[ed] [his] reflection through the windows all the time just to intimate [him.]" *Id.* at 87:7-11.  Plaintiff also testified that "[he] was the only one who would report to work on time and everybody else was on flexible hours.  Every time [plaintiff] had to leave the building, [he] ha[d] to ask [for] permission[] for lunch. [Plaintiff] ha[d] to ask [for] permission[] and nobody else would ask for permission[]." *Id.* at 86:13-18.  Moreover, plaintiff asserts that Otten treated him less favorably than, John Burton, an American-born Caucasian civil engineer that Otten also supervised.  Pl.'s Mem. Law Opp. Def.'s Mot. Summ. J. [hereinafter Pl.'s Opp'n] at 6 (citing

Pl's Dep. at 86:16-18, 177:4-11).  Defendant claims that plaintiff's information about Burton is

based on "misinformation and hearsay."  Def. SUF ¶ 69.

**B.  The December 2015 Corrective Action Plan and Plaintiff's Employee**
**Performance Reviews**

"[I]n late 2015, plaintiff received an overall unsatisfactory rating on his annual employee

performance review ("EPR") for [the] rating period [of] October 1, 2014 to October 1, 2015."

Def.'s SUF ¶ 13.  "As a result of the unsatisfactory EPR for the annual rating period ending

October 1, 2015, plaintiff was placed on a [Corrective Action Plan ("CAP")], presented to him

on December 23, 2015.  *Id.* ¶ 14.  The areas in which plaintiff was rated under the December

2015 CAP were: (1) job knowledge/skills; (2) work results; (3) communications; (4)

initiative/problem solving; (5) interpersonal relations/equal employment opportunity; and (6)

work habits.  *Id.* ¶ 15.  The CAP set forth the criteria necessary for a satisfactory performance in

each of the six areas.  *Id.* ¶ 16; Def.'s Ex. 18 (detailing criteria).  "Under the CAP, interim EPRs

were issued to plaintiff for each of [the] CAP's standards; he was to be rated as satisfactory on

the interim EPRs only if all objectives were satisfactorily accomplished during the rating

period."  Def.'s SUF ¶ 22.  Plaintiff, however, asserts that "[t]he criteria for meeting the

objectives was subjective" and was determined by Otten and Hanney, "the two individuals that

Plaintiff alleges[s] were discriminating and harassing him."  Pl.'s Resp. Def.'s SUF ¶ 15.

Otten drafted plaintiff's interim EPRs and reviewed them with Hanney.  Def.'s SUF ¶ 51.

After Hanney and Otten agreed on the language and rating, they scheduled meetings to discuss

the interim EPR results with plaintiff, and to give him a copy of the interim EPR.  *Id.* ¶¶ 51, 56;

Def.'s Ex. 21 at 51.  Otten, Hanney, and Cheryl Babiarz, a Human Resource Analyst, attended

the interim EPR meetings with plaintiff. Def.'s Ex. 21 at 51.  Additionally, Louis Belmonte,

Hanney's direct supervisor, attended most of those meetings.  Def.'s Ex. 20 at 46-8.  Belmonte

testified that he concurred with Otten's findings at the May 2, 2017 interim EPR meeting. *Id.* Plaintiff testified that this process was a "a conspiracy to just get [him.]" Pl.'s Dep. 109:10-24, 472:10-15. Plaintiff also asserts that Otten and Hanney manipulated and fabricated their findings with respect to the CAP in order to terminate plaintiff's employment. Pl.'s Resp. Def.'s SUF ¶ 16; Pl.'s Dep. 476:19-20.

Plaintiff was issued six interim EPRs from February 4, 2016 until May 2, 2017. *See infra* Part II.B. He failed to meet the CAP standards for each one. *See infra* Part II.B.

Plaintiff's first interim EPR was issued on February 4, 2016, "for the period of December 23, 2015 through February 3, 2016." *Id.* ¶ 25; Def.'s Ex. 9. Plaintiff failed to meet the CAP standards for the first interim EPR. *Id.* ¶ 26; Def.'s Ex. 9. Specifically, plaintiff received an overall unsatisfactory rating, and an unsatisfactory rating in the areas of job knowledge/skills, work results, communications, and initiative/problem solving. Def.'s Ex. 9. This interim EPR stated that "[b]asic concepts must be explained" to plaintiff and that "[b]asic engineering judgment is not being employed." *Id.* During this period, plaintiff submitted two reviews that were late, and four that required corrections to comply with PennDOT policy and regulations. *Id.* Additionally, the interim EPR stated that plaintiff sent an email to his supervisor that was unprofessional, disrespectful, "smug, and terse." *Id.*

Plaintiff's second interim EPR was issued on March 18, 2016, for the period of February 4, 2016 through March 17, 2016. Def.'s SUF ¶ 25; Def.'s Ex. 13. Plaintiff failed to meet the CAP standards for the second interim EPR. Def.'s SUF ¶ 26; Def.'s Ex. 13. Plaintiff received an overall unsatisfactory rating, and an unsatisfactory rating in the areas of job knowledge/skills, work results, communications, interpersonal relations/equal employment opportunity, and work habits. Def.'s Ex. 13. Specifically, the EPR states that: plaintiff submitted eight reviews that

required corrections to comply with PennDOT policy and regulations, he "has not shown proficiency in accurately assessing sight distance values and drainage design," "[p]rincipal concepts must still be explained," "[b]asic engineering judgment is not being employed leading to incorrect sight distance values being included in review comments and missing comments on drainage design," plaintiff exhibited threatening behavior toward another unit employee, and plaintiff "continue[d] to make defamatory statements about coworkers and supervisors." *Id.* On April 12, 2016, plaintiff received a written reprimand for unsatisfactory work performance. Def.'s SUF ¶ 27.

Plaintiff's third interim EPR was issued on June 20, 2016, for the period of March 18, 2016 through June 20, 2016.  Def.'s SUF ¶ 29; Def.'s Ex. 14.  Again, plaintiff failed to meet the CAP standards and "received an overall rating of unsatisfactory, with the rating of unsatisfactory in the areas of job knowledge/skills and work results based on corrections that needed to be made to the highway occupancy permits that he reviewed during that rating period."  Def.'s SUF ¶ 29. "During that rating period, plaintiff reviewed nineteen highway occupancy permit applications. Fourteen of these applications required extensive corrections, which amounts to 74%." *Id.* Additionally, the third interim EPR stated that "[plaintiff] has not shown proficiency in accurately assessing sight distance values and drainage design," "[p]rincipal concepts must still be explained," "[b]asic engineering judgment is not being employed leading to incorrect sight distance values being included in review comments and missing comments on drainage design," plaintiff sent an email that "had an unprofessional and defamatory statement" toward a coworker, and plaintiff exhibited threatening behavior toward another coworker on June 3, 2016.  Def.'s Ex. 14

On August 15, 2016, based on the third interim EPR, plaintiff received a Level One Alternative Discipline in Lieu of Suspension ("ADLS").  Def.'s SUF ¶ 29, 30.  Plaintiff was suspended for one day, with pay.  Reda Decl. ¶ 7.  On August 31, 2016, plaintiff filed a State Civil Service Commission ("SCSC") complaint challenging this suspension.  *See infra* Part II.C.

Plaintiff's fourth interim EPR was issued on October 26, 2016, for the period of June 21, 2016 through October 26, 2016.  Def.'s SUF ¶ 32; Def. Ex. 15.  Plaintiff again failed to meet the CAP standards.  Def.'s SUF ¶ 32.  "During that period plaintiff reviewed twenty-two highway occupancy permit applications; eleven of these applications required extensive corrections, which amounts to 50%."  *Id.*  Additionally, the fourth interim EPR stated that "[plaintiff] has not shown proficiency in accurately assessing sight distance values and drainage design," "[p]rincipal concepts must still be explained," "[b]asic engineering judgment is not being employed leading to incorrect sight distance requirements and values being included in review comments and missing comments on drainage design," and plaintiff "exhibited disruptive behavior during multiple instances."  Def. Ex. 15.  "Based on the fourth interim EPR, plaintiff received a Level-Two ADLS with final warning . . . dated November 28, 2016, for unsatisfactory work performance."  *Id.*  Plaintiff was suspended for three days with pay.  Reda Decl. ¶ 7.  On December 7, 2016, plaintiff filed a SCSC complaint challenging this suspension.  *See infra* Part II.C.

Plaintiff's fifth interim EPR was issued on March 16, 2017, for the period of October 27, 2016 to January 17, 2017. Def.'s SUF ¶ 37; Def.'s Ex. 16.  This interim EPR was revised to start on November 29, 2016 and end on January 17, 2017.  Def.'s SUF ¶ 37.  During this period, plaintiff again failed to meet the CAP standards.  *Id.*  Specifically, "plaintiff reviewed nine highway occupancy permit applications.  Five of these applications required major corrections,

which amounts to more than 50%." *Id.* The fifth interim EPR recounted similar deficiencies with plaintiff's work as described by the prior four interim EPRs. Def.'s Ex. 16. "Based on the revised fifth interim EPR, plaintiff received a second Level-Two ADLS, with final warning, dated March 22, 2017, for unsatisfactory work performance." Def.'s SUF ¶ 37. "PennDOT gave plaintiff an extra second level discipline rather than proceed to the termination level, because plaintiff was a [long-time] employee and PennDOT gave him every opportunity to improve his work performance." *Id.* As a result, plaintiff was suspended for three days with pay. Reda Decl. ¶ 7. On April 10, 2017, plaintiff filed a SCSC complaint challenging this suspension. *See infra* Part II.C.

Plaintiff received his sixth interim EPR on May 2, 2017, "for the rating period of March 23, 2017 to May 2, 2017." Def.'s SUF ¶ 39; Def.'s Ex. 17. According to the sixth interim EPR, plaintiff failed to meet the CAP standards. Def.'s SUF ¶ 39. "During that period[,] he reviewed thirteen highway occupancy permit applications. Five of these applications required major corrections, which amounts to almost 40%." *Id.* The sixth interim EPR recounted similar deficiencies with plaintiff's work as described by the prior five interim EPRs. Def.'s Ex. 17.

PennDOT terminated plaintiff's employment on June 23, 2017. *Id.* ¶ 62. Defendant contends that "the termination decision was made based on plaintiff's EPRs and any responses, materials, comments he provided." *Id.* On June 29, 2017, plaintiff filed a SCSC complaint challenging his termination. *See infra* Part II.C.

### C.  Plaintiff's Complaints

Plaintiff filed numerous complaints regarding, *inter alia*, purported discrimination and retaliation that he allegedly suffered while employed by PennDOT. *See infra.* None of

plaintiff's complaints were sustained by the respective reviewing organizations. *See infra*.

Below is a list of plaintiff's complaints and the results:

        i.    <u>Plaintiff's Internal Complaints</u>

- On October 18, 2011, plaintiff filed an internal Equal Employment Opportunity ("EEO") complaint with PennDOT alleging discrimination based on union membership, retaliation, unequal overtime, and purported illegal activities by his manager and supervisors. Def.'s SUF ¶ 8; Def.'s Ex. 39. After an investigation, PennDOT concluded that plaintiff's claims were not substantiated. Def.'s SUF ¶ 8.[2]

- In November 2012, plaintiff filed a second internal EEO complaint with PennDOT alleging discrimination based on "union membership, race, religion and national origin, and discrimination to cover for illegal activities, in addition to retaliation in connection with disciplinary action." Leber Decl. ¶¶ 11-12. After an investigation, PennDOT concluded that plaintiff's claims were not substantiated. Def.'s SUF ¶ 8; Leber Decl. ¶¶ 11-12.

- On November 6, 2013, plaintiff filed a third internal EEO complaint with PennDOT alleging discrimination based on union membership, retaliation, unequal overtime, and purported illegal activities by his manager and supervisors. Leber Decl. ¶¶ 16-18. After an investigation, PennDOT concluded that plaintiff's claims were not substantiated. *Id.*

- On December 30, 2015, plaintiff filed a fourth internal EEO complaint with PennDOT alleging disability discrimination and retaliation. Leber Decl. ¶ 19. Following his complaint, plaintiff emailed the PennDOT EEO office to report alleged "harassment, intimidation, retaliation and theft of overtime money, as well as challenges to [his] December 2015 [CAP.]" *Id.* ¶ 23. He also reported his suspicions of illegal activity. *Id.* ¶ 24. PennDOT ceased investigating this complaint "in light of [plaintiff's] present lawsuit." Def. SUF ¶ 23 n.2.

        ii.    <u>Plaintiff's PHRC and EEOC Complaints</u>

- In 2012, plaintiff dual filed a complaint with the Pennsylvania Human Relations Commission ("PHRC") and the EEOC alleging national origin and race discrimination. Def.'s SUF ¶ 8; Reda Decl. ¶ 6. The PHRC dismissed the complaint upon a finding of no probable cause, and the EEOC accepted the PHRC's findings. Def.'s SUF ¶ 8; Reda Decl. ¶ 6; Def. Ex. 30.

---

[2]      On December 30, 2011, plaintiff also filed a complaint with the Pennsylvania Inspector General alleging that four managers were engaged in a for-profit scheme to issue improper and false highway occupancy permits. Def.'s Ex. 42. The Pennsylvania OIG interviewed plaintiff and found that "he was unable to provide any evidence supporting his claim." *Id.* The Pennsylvania OIG closed its investigation on April 4, 2012 and concluded that there was not enough evidence to proceed with an investigation. *Id.*

- On March 26, 2014, plaintiff dual filed his second complaint with the EEOC and PHRC alleging national origin discrimination and retaliation in violation of Title VII.  Reda Decl. ¶ 6; Def.'s Ex. 29.  The EEOC dismissed the complaint in January 2015.  Reda Decl. ¶ 6.

- On May 20, 2016, plaintiff dual filed his third complaint with the EEOC and PHRC alleging discrimination based on race and national origin, and retaliation in violation of Title VII.  Reda Decl. ¶ 6; Def.'s Ex. 31.  The EEOC dismissed the complaint on August 16, 2017.  Reda Decl. ¶ 6; Def.'s Ex. 35.

- On August 9, 2017, plaintiff dual filed his fourth complaint with the EEOC and PHRC alleging discrimination based on national origin, and retaliation in violation of Title VII based on his termination.  Reda Decl. ¶ 6; Def.'s SUF ¶ 67; Def.'s Ex. 36a.  The EEOC dismissed the complaint on August 16, 2017, without requiring an answer from PennDOT.  Reda Decl. ¶ 6.

### iii.   Plaintiff's State Civil Service Commission Complaints

- On August 31, 2016, plaintiff filed a SCSC complaint challenging a one-day suspension that he received that month for unsatisfactory work performance.  Def.'s Ex. 28.  He alleged discrimination by Otten and Hanney based on national origin, race, and disability.  Plaintiff also alleged violation of the Civil Service Act, and retaliation for filling an EEO complaint.  Reda Decl. ¶ 7; Def.'s SUF ¶ 63.  The Commission conducted a hearing on February 28, 2017.  Def.'s SUF ¶ 63; Def.'s Ex. 26.  Following the hearing, the Commission sustained PennDOT's imposition of discipline.  Def.'s SUF ¶ 63.  There was no appeal to a Pennsylvania state court.  *Id.*

- On December 7, 2016, plaintiff filed a second SCSC complaint challenging a three-day suspension he received that month for unsatisfactory work performance.  Reda Decl. ¶ 7; Def.'s SUF ¶ 63; Def.'s Ex. 29.  Plaintiff alleged "national origin, race and disability discrimination as well as retaliation."  Def.'s SUF ¶ 63.  The Commission conducted a hearing on February 28, 2017. Def.'s SUF ¶ 63; Def.'s Ex. 26.  Following the hearing, the Commission sustained PennDOT's imposition of discipline.  Def.'s SUF ¶ 63.  There was no appeal to a Pennsylvania state court.  *Id.*

- On April 10, 2017, plaintiff filed a third SCSC complaint challenging a three-day suspension he received that month for unsatisfactory work performance.  Reda Decl. ¶ 7; Def.'s SUF ¶ 64; Def.'s Ex. 28.  Plaintiff "claimed discrimination based on race, disability, and retaliation for filing unspecified EEO complaints.  Def.'s SUF ¶ 64; Reda Decl. ¶ 7.  The Commission conducted a hearing on June 19, 2017.  Def.'s SUF ¶ 64; Def.'s Ex. 25.  Following the hearing, the Commission sustained PennDOT's imposition of discipline.  Def.'s SUF ¶ 64.  There was no appeal to a Pennsylvania state court.  *Id.*

- On June 29, 2017, plaintiff filed his fourth SCSC complaint challenging his termination. Reda Decl. ¶ 7; Def.'s SUF ¶ 65; Def.'s Ex. 27.  Plaintiff alleged discrimination based on his religion, affiliation, national origin, disability.  Reda Decl. ¶ 7; Def.'s SUF ¶ 65.  He

also alleged retaliation based on "filing complaint with EEO and EEOC, filing multiple complaints with the SCSC." *Id.* The Commission conducted a hearing on June 19, 2017. Def.'s SUF ¶ 65; Def.'s Ex. 25. Following the hearing, the Commission sustained the discharge. Def.'s SUF ¶ 65. There was no appeal to a Pennsylvania state court. *Id.*

### D.  Procedural History

On November 17, 2017, plaintiff filed the Complaint in this action and asserted the following claims: race discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* (Count I); race discrimination under the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.* (Count II); national origin discrimination under Title VII (Count III); national origin discrimination under the PHRA (Count IV); retaliation under Title VII (Count V); and retaliation under the PHRA (Count VI).

On October 3, 2019, defendant moved for summary judgment on all claims. Plaintiff responded on December 16, 2019 (Document No. 36). Defendant filed a Reply on December 27, 2019 (Document No. 37). The Motion is thus ripe for decision.

## III.   LEGAL STANDARD

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. However, the existence of a mere "scintilla" of evidence in support of the nonmoving party is insufficient.

*Id.* at 252.  In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor."  *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007) (internal citations omitted).  The party opposing summary judgment must, however, identify evidence that supports each element on which it has the burden of proof.  *Celotex Corp.*, 477 U.S. at 322.

## IV.  DISCUSSION

In the Motion for Summary Judgment, defendant argues that: (1)  the Court lacks subject matter jurisdiction over plaintiff's PHRA claims; (2) the SCSC adjudications of plaintiff's prior discrimination and retaliation claims collaterally estop plaintiff's claims in this case; (3) plaintiff's claims based on race and national origin discrimination fail as a matter of law; and (4) plaintiff's retaliation claims fail as a matter of law.  The Court will address each argument in turn.

### A.  The Eleventh Amendment Bars Plaintiff's PHRA Claims

Defendant argues that the Court lacks subject matter jurisdiction over plaintiff's PHRA claims because "PennDOT is an arm of the state for Eleventh Amendment immunity purposes," and Pennsylvania has "retained its Eleventh Amendment immunity against PHRA claims brought in federal courts."  Def.'s Mot. Summ. J at 3.  The Court agrees with defendant that the Eleventh Amendment bars plaintiff's PHRA claims against PennDOT in this case. [3]

"The Eleventh Amendment bars a suit against a state in federal court regardless of the relief sought by a plaintiff."  *Scott v. Com. Dep't of Pub. Welfare*, No. CIV.A. 02-3799, 2003 WL 22133799, at *3 (E.D. Pa. Aug. 28, 2003) (DuBois, J.) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 58 (1996)); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 694 n.2 (3d

---

[3]     Congress validly abrogated the states' Eleventh Amendment immunity with respect to actions brought under Title VII.  *Fitzpatrick v. Bitzer*, 427 U.S. 445, 447-457 (1976); *Patterson v. Pa. Office of Inspector Gen.*, 243 F. App'x 695, 696 (3d Cir. 2007).  Thus, the Eleventh Amendment does not bar plaintiff's Title VII claims.

Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of

subject matter jurisdiction.").  Eleventh Amendment immunity extends to agencies and

departments of the state.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)

("It is clear, . . . that in the absence of consent[,] a suit in which the State or one of its agencies or

departments is named as the defendant is proscribed by the Eleventh Amendment.").  This

immunity, however, may be abrogated by Congress.  *Seminole Tribe*, 517 U.S. at 55.  A state

may also "waive its Eleventh Amendment protection and allow a federal court to hear and decide

a case commenced or prosecuted against it."  *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S.

261, 267 (1997).

"PennDOT is clearly a state agency and thus eligible for Eleventh Amendment

protection."  *Fitzpatrick v. Pa. Dep't of Transp.*, 40 F. Supp. 2d 631, 634 (E.D. Pa. 1999)

(holding that PHRA claims against PennDOT are barred by the Eleventh Amendment); *see also*

*Burnette v. City of Phila*, No. CIV.A. 13-0288, 2013 WL 1389753, at *4 (E.D. Pa. Apr. 5, 2013).

Moreover, "Pennsylvania has retained its immunity against PHRA claims when they are brought

in federal court."  *Dieffenbach v. Dep't of Revenue*, 490 F. App'x 433, 435 (3d Cir. 2012) (citing

42 Pa. Cons. Stat. Ann. § 8521(b)); *Duckett v. Dep't of Health & Human Servs.*, No. CV 18-

4017, 2019 WL 3216612, at *4 n.4 (E.D. Pa. July 17, 2019); *Merces-Clark v. Pennsylvania*, No.

CIV.A. 13-02111, 2013 WL 6096324, at *3 (E.D. Pa. Nov. 19, 2013).  Because PennDOT is

entitled to Eleventh Amendment protection, and Pennsylvania has retained its immunity against

PHRA claims in federal court, the Court concludes that plaintiff's PHRA claims against

PennDOT (Counts II, VI, and VI) are barred by the Eleventh Amendment.

### B.  Collateral Estoppel Does Not Apply to Unreviewed Agency Determinations in Title VII Proceedings

Defendant argues that the SCSC adjudications of plaintiff's prior discrimination and retaliation claims collaterally estop plaintiff's Title VII claims in this case.  The Court disagrees with defendant on this issue.

"The doctrine of collateral estoppel, . . . commonly referred to as issue preclusion, prevents parties from litigating again the same issues when a court of competent jurisdiction has already adjudicated the issue on its merits, and a final judgment has been entered as to those parties and their privies."  *Witkowski v. Welch*, 173 F.3d 192, 198 (3d Cir. 1999).  "Federal law requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state from which the judgments emerged."  *Brooks v. CBS Radio, Inc.*, No. CIV.A. 07-0519, 2007 WL 4454312, at *5 (E.D. Pa. Dec. 17, 2007), *aff'd*, 342 F. App'x 771 (3d Cir. 2009).

"[W]hile it is clear that a state court's judgment affirming a state administrative agency's determination is entitled to preclusive effect in a subsequent Title VII action under 28 U.S.C. § 1738, it is equally well established that unreviewed state administrative proceedings do not receive preclusive effect on Title VII claims brought in federal court."  *Brooks v. CBS Radio, Inc.*, 342 F. App'x 771, 778 (3d Cir. 2009) (internal citations omitted).  Importantly, the Supreme Court decision in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986) "prohibits the use of collateral estoppel to give an unreviewed state administrative determination preclusive effect in a Title VII action."  *Caver v. City of Trenton*, 420 F.3d 243, 259 (3d Cir. 2005); *see also Roth v. Koppers Indus.*, 993 F.2d 1058, 1062 (3d Cir. 1993) (holding that unreviewed findings of Pennsylvania state agency "may not be given issue preclusive effect in a subsequent Title VII action"); *McInnes v. State of Cal.*, 943 F.2d 1088, 1093 (9th Cir. 1991) ("The clear teaching of

13

[*University of Tennessee v. Elliott*, 478 U.S. 788 (1986)] is that in a Title VII action a prior state decision enjoys issue preclusive effect only if rendered or reviewed by a court.").

In this case, the four SCSC adjudications were not reviewed by any court.  *See supra*, Part II.  Therefore, the SCSC adjudications do not collaterally estop plaintiff from proceeding on his Title VII claims.

### C.  Plaintiff's National Origin and Race Discrimination Claims Under Title VII Fail

Defendant argues that plaintiff has failed to establish a *prima facie* case of discrimination under Title VII and that, even if plaintiff could establish a *prima facie* case, he cannot show that defendant's legitimate nondiscriminatory reason for its adverse employment action was pretextual.  The Court concludes that plaintiff has failed to create a genuine issue of material fact with respect to his Title VII discrimination claims.

Plaintiff alleges that he was discriminated against because of his race and national origin in violation of Title VII.  Compl. ¶¶ 41-49, 53-61.  Title VII states that "[i]t shall be an unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–2(a).  A plaintiff may prove race or national origin discrimination under Title VII "by direct evidence as set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or indirectly through the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Knight v. Delaware Econ. Dev. Office*, 83 F. Supp. 3d 606, 613 (D. Del. 2015); *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) ("When a plaintiff attempts to prove a discrimination claim under a pretext theory, the *McDonnell Douglas* burden-shifting framework applies.").  Plaintiff attempts to prove his national origin and race

14

discrimination claims under Title VII with indirect evidence.  Pl.'s Opp'n at 5.  Accordingly, the parties agree that such claims must be analyzed under the burden-shifting framework set forth in *McDonnell Douglas*.  Def.'s Mot. Summ. J. at 13; Pl.'s Opp'n at 5.

Under the *McDonnell Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.  *Butler v. Arctic Glacier USA*, 213 F. Supp. 3d 711, 716 (E.D. Pa. 2016); *Young v. St. James Mgmt., LLC*, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010).  If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason' for the adverse employment action." *Barker v. Boeing Co.*, 21 F. Supp. 3d 417, 423 (E.D. Pa. 2014) (quoting *McDonnell Douglas*, 411 U.S. at 802), *aff'd*, 609 F. App'x 120 (3d Cir. 2015).  If such a reason is proffered, the burden shifts back to the plaintiff to demonstrate that the employer's stated reason for the adverse employment action was merely a pretext for intentional discrimination.  *Young*, 749 F. Supp. 2d at 289.  "Although the burden of production of evidence shifts, 'the plaintiff has the ultimate burden of persuasion at all times.'"  *Butler*, 213 F. Supp. 3d at 716 (quoting *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015)).

      i.    <u>*Prima Facie* Case of National Origin and Racial Discrimination</u>

"To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that he: (1) was a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and, (4) the circumstances of the adverse employment action imply discrimination."  *Butler*, 213 F. Supp. 3d at 716 (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999)); *Makky*, 541 F.3d at 214.

Assuming *arguendo* that plaintiff has established a *prima facie* case of race and national origin discrimination under Title VII, the Court concludes that plaintiff fails to show that defendant's proffered non-discriminatory reason for terminating his employment was pretextual.

ii.   Legitimate Non-Discriminatory Reason

At the second step of the *McDonell Douglas* framework, the employer must "articulate[s] a legitimate, non-discriminatory reason for the adverse employment action." *Makky*, 541 F.3d at 214.  Defendant asserts that it terminated plaintiff's employment because of his "repeated poor work performance, including his refusal to follow his supervisors' directions and to adapt his work performance to comply with the CAP."  Def.'s Mot. Summ. J. at 23.  This explanation meets defendant's "relatively light burden" of production under *McDonnell Douglas*.  *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (citing *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994)).

iii.   Pretext

Based on such evidence of a legitimate non-discriminatory reason for plaintiff's termination, the burden shifts back to plaintiff at the third step of the *McDonnel Douglas* analysis to show that defendant's explanation is pretextual.  To survive a motion for summary judgment, a nonmoving plaintiff must submit evidence which: (1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication;" or (2) "allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762.

Plaintiff argues that that defendant's explanation is pretextual because he "can establish discrimination under the Cat's Paw theory of liability."  Pl.'s Opp'n at 7.  Under the cat's paw

theory of liability, an employer may "be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *Mason v. Se. Pa. Transp. Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015) (citing *McKenna v. City of Phila.*, 649 F.3d 171, 178 (3d Cir. 2011)); *see also Carter v. Midway Slots & Simulcast*, 894 F. Supp. 2d 529, 543 (D. Del. 2012), *aff'd*, 511 F. App'x 125 (3d Cir. 2013).

Before addressing plaintiff's argument, the Court notes that there is a doctrinal tension with plaintiff's use of the cat's paw theory under the *McDonnell Douglas* framework because "the cat's paw theory originated in the context of mixed-motive discrimination claims," *Kowalski v. Postmaster Gen. of United States*, No. 19-1984, 2020 WL 2079460, at *4 (3d Cir. Apr. 29, 2020), "not claims pursued through the *McDonnell Douglas* burden-shifting framework," because "the [cat's paw] theory is premised on a biased subordinate." *Diaz v. Tyson Fresh Meats, Inc.*, 643 F.3d 1149, 1152 (8th Cir. 2011) (noting the "uneasy marriage between the *McDonnell Douglas* framework and a cat's paw theory of employer liability"); *see also Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 427 (6th Cir. 2014) (declining to consider "whether and to what extent cat's paw liability fits into the [*McDonnell Douglas*] framework). Despite this tension, the Third Circuit and several other Courts of Appeals have applied the cat's paw theory of liability in the pretext step of the *McDonnell Douglas* framework. *See, e.g.*, *Durst v. City of Phila.*, 798 F. App'x 710, 714 (3d Cir. 2020) (applying cat's paw theory during pretext step of *McDonnell Douglas* framework); *Neidigh v. Select Specialty Hosp.-McKeesport*, 664 F. App'x 217, 222 (3d Cir. 2016) (same); *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 70 (1st Cir. 2015) (same); *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (same); *but see DeNoma v. Hamilton Cty. Court of Common Pleas*, 626 F. App'x 101, 105

(6th Cir. 2015) (analyzing *McDonnell Douglas* steps and cat's paw elements separately).  This

Court follows Third Circuit precedent and analyzes plaintiff's cat's paw argument in the pretext

step of the *McDonnell Douglas* framework.[4]  This requires plaintiff to satisfy all the elements of

cat's paw liability in order to prove pretext.

      To survive summary judgment based on a cat's paw theory of liability, a plaintiff must

establish (1) a genuine issue of material fact concerning the bias of the subordinate, and (2) a

genuine issue of material fact "as to whether the proffered reason for the employment action is

pretextual, which in a [cat's paw] claim requires the plaintiff to demonstrate a causal relationship

between the subordinate's actions and the employment decision."  *Mason*, 134 F. Supp. 3d at

874 (quoting *E.E.O.C. v. BCI Coca-Cola Bottling Co. of Los Angeles*, 450 F.3d 476, 488 (10th

Cir. 2006)).  To establish a causal relationship between the actions of a subordinate and the

employment decision plaintiff must show proximate cause— "'some direct relation between the

injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely

contingent, or indirect.'"  *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015)

(quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)); *Lamb v. Montgomery Twp.*, 734 F.

App'x 106, 113 (3d Cir. 2018) (noting requirement of proximate cause in cat's paw cases).

      Plaintiff argues that defendant is liable under the cat's paw theory of liability because,

although Otten and Hanney did not terminate plaintiff's employment, they "harbored

discriminatory and retaliatory animus" against him.  Pl.'s Opp'n at 8.  Plaintiff claims that Otten

and Hanney "prepared false evaluations to effectuate an adverse employment action" against

---

[4]     Even if the Court considered plaintiff's cat's paw argument separately from the traditional *McDonnell Douglas* framework, plaintiff's discrimination and retaliation claims under Title VII would fail.  First, as discussed *infra*, plaintiff's cat's paw argument fails.  Second, plaintiff is unable to prove pretext under the traditional *McDonnell Douglas* framework.  Plaintiff's testimony that "the whole thing was fabricated," and "it's a conspiracy to just get me. . . . No matter what I do, . . . they're still not satisfied because they were trying to get rid of me," Pl.'s Dep. 476:19-20, 472:10-15, is insufficient to demonstrate pretext under the traditional *McDonnell Douglas* framework.  *See Fuentes*, 32 F.3d at 764.

plaintiff, "fashioned the standard on the interim evaluations to be a subjective standard that Plaintiff could only meet if they found him to be satisfactory, and . . . fabricated their findings so that Plaintiff would not meet the subjective standard." *Id.* (citing Pl.'s Dep. 476:19-20).  In sum, plaintiff states that he "was set up to fail because Otten and Hanney were trying to get rid of [him]." *Id.* (citing Pl.'s Dep. 472:10-15).  According to plaintiff, defendant "is liable for discrimination because it relied on" the "false evaluations" prepared by Otten and Hanney when it decided to terminate plaintiff's employment. *Id.* at 9.  The Court disagrees with plaintiff on this issue.

As discussed *supra*, in order to survive summary judgment based on a cat's paw theory of liability, a plaintiff must establish, *inter alia*, a genuine issue of material fact concerning the bias of the subordinate. *Mason*, 134 F. Supp. 3d at 874; *Diaz*, 643 F.3d at 1152 ("[T]he [cat's paw] theory is premised on a biased subordinate.").  The only evidence that plaintiff marshals in support of his cat's paw argument is his deposition testimony where he stated: (1) "the whole thing was fabricated," Pl.'s Dep. 476:19-20, and (2) "it's a conspiracy to just get me . . . no matter what, they're still not satisfied because they were trying to get rid of me," Pl.'s Dep. 472:10-15.  Pl.'s Opp'n at 8-9.  This testimony, however, does not show that Otten and Hanney "harbored discriminatory and retaliatory animus" toward plaintiff based on plaintiff's race or national origin. *Id.* at 8.  Because plaintiff failed to present any evidence of Otten or Hanney's discriminatory or retaliatory animus, his cat's paw argument fails. *See Kowalski*, 2020 WL 2079460, at *4; *Durst*, 798 F. App'x at 714; *Greenawalt v. Clarion Cty.*, 459 F. App'x 165, 169 (3d Cir. 2012); *Tucker*, 484 F. App'x at 713; *Gillyard v. Geithner*, 81 F. Supp. 3d 437, 446 n.8 (E.D. Pa. 2015); *Mason*, 134 F. Supp. 3d at 874.

The Court concludes that plaintiff has failed to show that defendant's proffered nondiscriminatory reason for terminating his employment was pretextual.  Therefore, defendant's motion for summary judgment on plaintiff's discrimination claims under Title VII (Counts I and III) is granted.

**D.  Plaintiff's Retaliation Claim Under Title VII Fails**

Because plaintiff seeks to prove his retaliation claim through indirect evidence, his retaliation claim under Title VII is also governed by the burden-shifting framework of *McDonnell Douglas*.  *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017).  Under the *McDonell Douglas* framework as it relates to a retaliation claim, a plaintiff first bears the burden of establishing a *prima facie* case of retaliation.  *Moore v. City of Phila.*, 461 F.3d 331, 340 (3d Cir. 2006), *as amended* (Sept. 13, 2006).  If the plaintiff establishes a *prima facie* case, the burden shifts to defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse employment action.  *Id.* at 342.  The burden is one of production, not persuasion.  *Daniels*, 776 F.3d at 193.  If the employer offers a legitimate, non-retaliatory explanation, in order to survive summary judgment, the plaintiff must then submit evidence "that the employer's proffered explanation was false [that is, a pretext], and that retaliation was the real reason for the adverse employment action."  *Moore*, 461 F.3d at 342. Notwithstanding this burden-shifting framework, the plaintiff always bears the ultimate burden of persuading the trier of fact that the employer retaliated against him.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 301 n.11 (3d Cir. 2007), *as amended* (Aug. 28, 2007).

i.  *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation under the *McDonnell Douglas* framework, a plaintiff must show "(1) [that he engaged in] protected employee activity; (2) adverse action by

the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

In this case, assuming *arguendo* that plaintiff has established a *prima facie* case of retaliation under Title VII, the Court concludes that plaintiff fails to show that defendant's proffered non-retaliatory reason for terminating his employment was pretextual.

### ii.   Legitimate Non-Retaliatory Reason

At the second step of the *McDonell Douglas* framework, the employer must advance a legitimate, non-retaliatory reason for terminating plaintiff's employment. *Moore*, 461 F.3d at 342. Defendant states that it terminated plaintiff's employment because of "his continued unsatisfactory work performance." Def.'s Mot. Summ. J. at 28; *see also* Def.'s Mot. Summ. J. at 23 (stating that PennDOT terminated plaintiff's employment because of his "repeated poor work performance, including his refusal to follow his supervisors' directions and to adapt his work performance to comply with the CAP"). This explanation meets defendant's "relatively light burden" of production under *McDonnell Douglas*. *Tomasso*, 445 F.3d at 706.

### iii.   Pretext

Based on defendant's evidence of a legitimate non-retaliatory reason for terminating plaintiff's employment, the burden shifts back to plaintiff at the third step of the *McDonnell Douglas* analysis to show that defendant's explanation is pretextual. At this stage of the proceedings, plaintiff caries the ultimate burden to "prove that retaliatory animus was the 'but-for' cause of the adverse employment action." *Pierce v. City of Phila.*, No. CV 17-05539, 2018 WL 6832093, at *13 (E.D. Pa. Dec. 28, 2018) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)). To show pretext, plaintiff must identify "some evidence, direct or

circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious [retaliatory] reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

In this case, plaintiff merely asserts that he "can demonstrate that [defendant's] reasons were pretextual for retaliation for the same reasons set forth above in demonstrating pretext for discrimination." Pl.'s Opp'n at 14. However, as discussed *supra* with respect to his Title VII discrimination claims, plaintiff has failed to demonstrate that defendant's nondiscriminatory reason for terminating his employment were pretextual. The Court likewise concludes that plaintiff has failed to show that defendant's proffered non-retaliatory reason for terminating his employment was pretextual. Therefore, defendant's motion for summary judgment on plaintiff's retaliation claim under Title VII (Count V) is granted.

## V.   CONCLUSION

For the foregoing reasons, the Court grants Defendant's Motion for Summary Judgment. Judgment is entered in favor of defendant, Pennsylvania Department of Transportation, and against plaintiff, Farzin Afrasiabipour.

An appropriate order follows.